## CONN et al. v. ROOS et al. [*]

(Circuit Court of Appeals, Fifth Circuit. July 24, 1926.)

No. 4756.

1. **Appeal and error** ⬳994(2).

It is province of District Judge to pass on credibility of witnesses.

2. **Mines and minerals** ⬳101.

Person suing to establish interest in oil lease must rely on contract alleged.

3. **Mines and minerals** ⬳101.

Evidence *held* insufficient to establish claim of interest in oil lease, under alleged contract that plaintiff and defendant would be equally interested in any oil lease in Mexico that might be secured by defendant.

4. **Evidence** ⬳271(1).

Declarations of person to third parties are not evidence in his favor.

5. **Depositions** ⬳36.

Refusal to reopen case and take depositions *held* not erroneous, where affidavits did not show that testimony would be as to any matter of substance, or where it would merely have been cumulative.

Appeal from the District Court of the United States for the Western District of Texas; Duval West, Judge.

Separate suits by S. J. Conn, trustee in bankruptcy of the estate of E. O. Burton, bankrupt, and by E. O. Burton, against Edward Roos and others. Decree for defendants, and plaintiffs appeal. Affirmed.

Edward Roos holds the legal title to a three-eighths interest in a very valuable oil lease of land in Vera Cruz, Mexico, referred to in the record as the "Obando lease." E. O. Burton filed a bill in equity to establish his claim to one-half of Roos' interest in that lease, and for an accounting of oil that had been produced therefrom.

The claim of interest asserted was based upon an averment in the bill that Burton and Roos entered into a contract whereby they agreed that they would become equally interested in any oil lease of land in Mexico that might be secured by Roos. A similar bill was later filed by Conn, Burton's trustee in bankruptcy. Roos answered and denied the existence of the contract alleged and that Burton or his trustee had any interest in the lease.

On the issue thus raised, the District Judge heard the witnesses. In April, 1921, at the conclusion of all the evidence, he announced his decision in favor of Roos, and in July, 1925, entered a final decree dismissing both bills of complaint. The entry of the final decree was delayed because of other is-

[*]Rehearing denied September 7, 1926.

sues, not material here, that were brought into the case by several petitions of intervention.

The principal contention of Burton and his trustee in bankruptcy in support of their appeal is that the decree of the District Judge is contrary to the great weight of the evidence. In this connection the further contention is made that the District Judge did not consider the weight of the evidence upon the vital question whether Burton and Roos entered into a contract for equal interests in any leases of land in Mexico that might be secured by Roos, but that the decree entered appears from an oral opinion of the District Judge to have been based solely on the admitted fact that Roos was in Mexico on the date fixed by Burton's testimony as the date on which they entered into and Roos signed the alleged contract at San Antonio, Tex. It becomes necessary to consider the evidence and the oral opinion of the District Judge, in order to determine whether in our opinion these contentions are well founded.

On April 19, 1915, at San Antonio, Roos obtained from Victor Obando an option to purchase for $8,000 an oil lease of land in Vera Cruz, Mexico. Obando acquired the lease from the owners of the lands in March and April, 1914. Roos exercised his option, but, at his request, Obando, on May 10, 1915, assigned the lease to R. E. Brooks, who was acting on behalf of the Texas Company.

The land covered by the lease is situated between two well-known oil fields, which, at the time the lease was assigned by Obando, had already been developed and were producing oil in large quantities. Brooks paid $10,000 for the assignment to him, of which Obando received $8,000 and Roos $2,000, and on the same day acknowledged by letter that Roos would be entitled to half of the net profits that might be derived from the lease. At the same time Brooks also lent $10,000 to Roos, accepted his note for that amount, payable one year from date, and stated in his letter that, upon payment of interest, the note would be extended from year to year until a test was made for oil, and until oil was produced in paying quantities, or the lease abandoned. Brooks signed and tendered to Roos for his signature and acceptance a formal contract, which provided that Roos should receive half of the net profits. Roos was not satisfied with the contract because, as he says, it did not secure to him an equal interest in the lease as distinguished from the net profits, and contained no obligation on the part of Brooks or the Texas Company for the prompt drilling of wells and development of

14 F.(2d)—5

the lease. In 1916 Roos employed the law firm of Lane, Wolters & Story to represent him in an effort to have his rights, in accordance with his contentions, defined by contract, and agreed to allow to them as their fee one-fourth of his half interest.

After negotiations, and in February, 1917, a contract was entered into between Brooks and Roos which recited that the beneficial interests in the lease were held, one-half by Brooks, three-eighths by Roos, and one-eighth by Lane, Wolters & Story. That contract provided for the development of the lease with due diligence, and contained a clause to the effect that no assignment, other than by Brooks to the company he represented, of any interest by any of the parties should be made except after such interest had been offered to the other parties interested in the contract and they had failed to purchase. On July 2, 1917, Roos borrowed an additional $5,000 from Brooks, and executed a note payable one year after date for approximately $17,000, which included the $10,000 previously borrowed and accrued interest. This note was secured by a mortgage on Roos' interest in the lease. Strangely enough, the terms of the mortgage are not disclosed by the record; but, as the note was payable on a definite date, Roos became fearful that, unless it should be paid when due, he might, through foreclosure proceedings, lose his interest in the lease. He complained to Jacob F. Wolters, one of the surviving members of the firm of Lane, Wolters & Story, who represented him in the preparation of the note and mortgage, because the $10,000 originally borrowed on the lease was included in the note, and insisted, but without success, that Wolters endeavor to procure from Brooks an acknowledgment that $10,000 of the amount secured by the mortgage would not be demanded until after wells had been drilled and oil produced, or the lease abandoned, in accordance with Brooks' letter of May 10, 1915. It is apparent that Roos also entertained the belief, though subsequent events proved it to be unfounded, that Brooks and the Texas Company were not in good faith undertaking to produce oil, but were deliberately delaying their operations for the purpose of foreclosing the mortgage and acquiring his interest in the lease. The first well drilled was finished in December, 1917, and was dry. The drilling of the second well was begun about April, 1918, and it was apparent to Roos that it would not be completed by July 2, 1918, at which time his note would be due. However, he was not required to pay his indebtedness until after the second well, which

proved to be a very valuable one, came in about the 1st of December, 1918. On March 1, 1921, the net profits derived from the lease amounted to upwards of $2,900,000.

During the year 1913, and for some years prior thereto, Burton and Roos lived in San Antonio. They were intimate friends, and had offices in the same building. Each was separately interested in buying and selling oil leases. Burton and one A. H. Danforth were partners in the real estate business, and owned land in at least two counties in Texas. Roos and Danforth had been partners in running a theater, but by the year 1912 that partnership had become unsuccessful, and a number of judgments, aggregating about $6,000, had been obtained against it. Some of these judgments had been recorded in counties in which the firm of Burton & Danforth owned land. Burton and Roos had a conference about May 2, 1913, as a result of which Roos contributed $1,000 and Burton the balance necessary to pay off the judgments. Burton took assignments of the judgments and released the property of Danforth in the counties in which the partnership of Burton & Danforth owned land. In addition to the judgments against them, Roos & Danforth owed $2,750 on a note, held at the time of the above-mentioned conference by the West Texas Bank, which Danforth had either signed or indorsed in the name of Burton & Danforth, and which was afterwards paid by Roos. In 1916 Burton released Roos, on the latter's demand, of all liability on the judgments, and Roos in turn surrendered the $2,750 note to Burton. Between December of 1917 and December of 1918 a number of letters passed between Burton in Houston and Roos in San Antonio. That correspondence relates to the subject of protecting the lease against foreclosure, and discloses that Burton reported that he had found a man who would lend the amount necessary to pay off the mortgage, and later, at the request of Roos, that he had procured from Wolters, one of the surviving members of the firm of Lane, Wolters & Story, some of Roos' papers bearing upon his controversy with Brooks' over the maturity of the original loan of $10,000. In one of his letters Burton reported that he had interviewed Mr. Vinson, an attorney, with the view of employing him to represent Roos, and stated: "Have told them (Vinson and his partner) that I could not bind you— only bring it to a point where they could deal direct with you."

Roos replied: "Since you decided to take our matter to a lawyer, or lawyers, I am glad that Wm. A. Vinson has been selected as one. * * * To understand about the $10,000 note of May, 1915, you must first see my letter of June, 1915, to Brooks, and his reply. Jake (Wolters) has these, but I do not know just how to get them, and I do not want it known that there are any others interested, until I can go over the whole matter with Vinson and Carlton and you."

A week later Roos wrote, "I hope you understood my last letter, which was written so that it could be shown to Vinson, if you so desired—it backed up whatever you might have said about your interest."

In reporting an interview with Scott, a representative of the Texas Company, Burton wrote: "Then I opened up on him about the Obando well—told him I had an interest in it with you, and that I wanted to know just where I stood—if they were going to call the turn on the money on July 1st, it was up to me to refinance it by paying it off. * * * He asked me if I got any of that money, and I told him I did not, and that I was not even consulted about it, and that I was pretty sore about the way it had been handled."

Roos replied: "Your novel way of getting them to open up, by pretending that you are sore at me, etc., seems to have worked according to your plans. * * * As you are an unbiased outsider and could have no personal interest in the matter except as advising a friend, for you to come to the conclusion as contained in your letter, 'You can mark it down that they are after you,' after you had but one interview with them, means, of course, that I had better heed your advice and realize their sinister purposes, and get ready, which I shall now proceed to do."

On March 26, 1918, Burton wrote that he had represented to Wolters that he was interested in the lease, and stated that he believed Wolters "has a wrong slant at that contract and is honestly mistaken." In reply Roos did not directly comment on Burton's claim of interest made to Wolters, but reviewed at considerable length his controversy with Brooks, and showed that he was dissatisfied with the manner in which Wolters had handled that controversy. In the course of his letter he referred to the contract and his rights under it and to the lease as his property. When the well came in, Roos wrote to Burton, "Our well is in;" and Burton replied, "That is sure glorious news about our big well in Mexico." Roos immediately by letter denied that Burton had any interest in the well or lease. Before that, the correspondence fails to disclose that an interest in the lease was either directly asserted by Burton or positively denied by Roos.

Burton, to sustain his claim that he was equally interested with Roos in the Obando lease, testified to the following effect: The idea of acquiring oil leases in Mexico was suggested to me in January, 1913, by Mrs. Ena M. Harper and a prominent Mexican named Aldape. I introduced Roos to Aldape, and there was a general understanding that when political conditions in Mexico seemed favorable Roos and I would go there to seek oil leases. Nothing further was done for awhile. Aldape, who afterwards became Minister of the Interior in Huerta's cabinet, was arrested in San Antonio for violations of the neutrality laws, and Roos became one of the sureties on his bond. I took up the judgments against Roos and Danforth for the purpose of enabling Roos to go to Mexico. On the 13th or 14th of May, 1913, Roos came to me and said, "If you will furnish me the cash to go to Mexico with, and protect me against these judgments so that my property will not be sacrificed while I am gone, I will go after those leases." I replied that I could not handle all of the judgments at that time. He then said that he could raise $1,000 to apply on the judgments, but for no other purpose. Thereupon I agreed to advance $500 to Roos, to be used on the trip to Mexico, and also to advance the necessary amount over and above $1,000 to take up the judgments against the partnership of Roos and Danforth, and to carry such judgments temporarily, but to be repaid eventually one-half by Roos and the other half by Danforth. Roos delivered to me his check for $1,000, and I delivered to him $500 in cash. As evidence of the transaction, I prepared and Roos signed a paper to the following effect: "Received of E. O. Burton five hundred dollars, to be used in securing oil leases or options on oil leases in Mexico, to be taken in my name but held for our equal joint benefit." That paper was lost out of my desk in 1916, but I showed it to A. J. Bell, my attorney, on the same day that it was executed. I obtained the $500 in currency, which I delivered to Roos, by cashing at "the bank" a certificate of deposit for that amount issued by the State Bank & Trust Company of San Antonio, payable three months after date to my wife. The certificate of deposit was dated February 3, 1913, was indorsed by Mrs. Burton only, and was stamped, "Paid May 14, 1913, through San Antonio Clearing House—National Bank of Commerce." It was perforated, "Paid 5 14 13." Within a week Roos left for Mexico and returned about two months later.

On direct examination: When he returned he told me that he had secured an op-tion on very valuable property in Mexico from a man by the name of Obando, and that the option was in writing, but that he had left it in New York.

On cross-examination: When he returned I do not recall that "he told me the name of the property, except Obando, that was all; he did not give me the description; he said he had gotten some leases from a man named Obando, and option on leases; he mentioned Obando very little."

On redirect examination: "I did not say Mr. Roos told me of the Obando option in 1913. I said there was Mexican options; there was no names for that that I recall. At that time he referred only to the districts and not the name; I do not remember the name having been used in 1913; I do not remember the name Obando having been used until some time much later."

Roos told me in May, 1915, that the Texas Company had a half interest in the lease under a drilling contract, but that he had not gotten any money out of the lease. He requested me not to disclose my interest in the lease, and gave as a reason that he had represented to Brooks that he was the sole owner. He said that the disclosure of my interest would cause him to lose control and get him "in bad" with the Texas Company. I knew of the contract by which Lane, Wolters & Story acquired their interest, but I did not know of the mortgage or that Roos had obtained any money on the lease until November or December, 1917. About that time Roos fully informed me of the condition of the lease; that is, of the mortgage upon it, of the probability that the well then being drilled would be dry, that oil would not be produced until after the indebtedness became due, and of the consequent danger of foreclosure and the total loss of our interest in the lease. Upon being so informed, I joined in with Roos for the purpose of protecting our joint interest, and to that end conducted negotiations with Wolters and representatives of the Texas Company. Roos never denied my interest in the lease until after the well came in in December, 1918, but on the contrary frequently spoke of our joint interest. In October, 1917, he was in my office and pointed out on a map the location of the Obando lease, and stated, in the presence of Beebe, Dunning, and Hoffman, that he and I owned it in equal portions, and that it would make us rich if we could get a square deal from the Texas Company. Within a few days after Roos had written the letter from San Antonio denying my interest, he came to my office in Houston, and at that time I told

him I wanted my interest in the Obando property defined by written contract. He replied that he could not do that, because he had to keep control, but that I would get my half of the money. Roos made statements to the effect that I was interested in the Obando well in the presence of H. E. Dunseth, on December 18, 1918, and in the presence of R. S. Pershing in January, 1919. On January 1, 1919, I received $300 from Roos, and on January 13, 1919, I received $300 more, as is shown by checks in evidence. The first check was on account of an additional loan of $10,000 that the Texas Company had made to Roos on the lease, and was accepted by me because he said that was all he could spare out of the loan. The second check was for a half interest in stock of the Texas Pine Island Oil Company, of the par value of $10,000.

Beebe, Dunning and Hoffman corroborated Burton's testimony in respect of Roos' admission against interest in their presence. Beebe testified that he had just returned from the oil fields near which the land covered by the Obando lease was located, that he was familiar with the developments that had taken place in those fields, and that his object in seeking an interview with Roos was to sell a lease which he held of land in that locality. He referred to the Los Naranjos wells in one of those fields as the Los Mirando. A letter was introduced in evidence, dated subsequently to this supposed interview, written by Burton, introducing Beebe to Roos; and a witness for Roos testified that Beebe did not recognize Roos when he called to present the letter of introduction. Dunning and Hoffman also referred to the Los Naranjos wells as the Los Mirando.

At the trial, Dunning identified Wolters, one of the attorneys, as Roos. Hoffman was an employee of the Rich Hill Oil Company, of which Burton was president. Pershing also corroborated Burton's testimony in respect of Roos' admission against interest in his presence, that witness was associated with Burton in the Texas Pine Island Oil Company. A. E. Unger, a physician, corroborated Burton's testimony as to the first interview in Burton's office after the second well struck oil. This witness stated that in December of 1918 he and Burton had offices on the same floor of the same building; that he went into Burton's office to use a telephone; that in this way he heard a part of a conversation between Burton and Roos; that a few days later Burton prepared a statement of that conversation and he signed it; and that he kept a copy of the statement and had read it over a number of times, the last time being about a

week before he testified. In further corroboration of his testimony, Burton produced as witnesses Lyman Burton, his son, A. J. Bell, his attorney, and H. E. Dunseth, vice president of the Rich Hill Oil Company, each of whom testified that Roos had admitted to him that Burton and Roos were equally and jointly interested in the Obando lease. Bell further testified that he saw the contract relied on in Burton's possession shortly after its execution, and that it was signed by Roos. In an effort to impeach Bell's testimony, Chas. T. Lark, attorney for Roos, testified Bell told him that, although Burton claimed to have such a contract, he (Bell) had never seen it. Bell denied the statement attributed to him by Lark, and testified that, although they had a conversation, it related to a paper purporting to be signed by Burton, releasing in favor of Roos any interest Burton might have had in oil leases in Mexico. Two witnesses, who were tellers of the West Texas Bank & Trust Company in 1913, testified, one that McCaleb had approved for payment Roos' check for $1,000 that was applied on the judgments against Roos and Danforth, and the other that he had instructions not to pay checks against Roos' account except upon approval of McCaleb or the vice president of the bank.

Burton was adjudged a bankrupt in September of 1917, but did not include in his schedule of assets his claim of interest in the Obando lease. He was discharged in bankruptcy in February of 1919, and filed this suit in August of 1919. Conn, the trustee in bankruptcy, filed his bill in January of 1920, claiming title to whatever rights Burton might have had in the lease. Bell, who represented Burton in the bankruptcy proceedings, testified that before the discharge in bankruptcy was granted he informed Conn of Burton's interest in the Obando lease. Conn did not testify.

Roos testified, in substance, as follows: He left San Antonio to go to Mexico on May 2, 1913, "having been invited to go there by some of the cabinet members of the government of Mexico, in connection with a loan for the Mexican government." He denied that he received $500 from Burton or signed a contract or agreed to give Burton a half interest in any lease he might obtain in Mexico. He proved conclusively that he left San Antonio on May 2, as stated by him, and was in Mexico City on May 13 and 14, when, according to Burton's testimony, he signed the contract in San Antonio. He did not deny that he was acquainted with Aldape and Mrs. Harper, and it appears that on May 14 he tele-

graphed from Mexico City to G. B. Mauermann, his attorney, in San Antonio, "Wire status seven neutrality cases," and on the same day received a reply, "R. G. Robello, Juan Didapp—Miguel Aldape judgment nisi must appear Dec. term—No action in others." While in Mexico he negotiated with a man named Oleson for an oil lease. He offered in evidence four checks, all dated May 2, 1913, drawn on the West Texas Bank & Trust Company, two to Mauermann for $100 and $1,000 respectively, one to bearer for $1,000, and one to his wife for $100. All these checks were stamped "Paid." While he was in Mexico he drew out of the same bank $400 on each of two separate occasions. The check for $1,000, payable to Mauermann, was delivered to Burton, who receipted for it on June 2, 1913. It was given to apply on judgments against Roos and Danforth, although he had already paid more than his proportion of the debts of that partnership, in pursuance of an agreement had with Burton to the effect that he would contribute that amount toward the satisfaction of those judgments and pay the $2,750 note referred to by Burton, and two other notes for $1,000 and $3,000, respectively, held by the West Texas Bank & Trust Company against Roos and Danforth, and that Burton on his part would pay the necessary balance and liquidate or satisfy such judgments. This settlement of the affairs of Roos and Danforth had no relation to his trip to Mexico.

He became acquainted with Obando through a broker in New York by the name of Merriwether. He had never seen or heard of Obando before April of 1915, and never spoke to Burton about the Obando lease until September of 1917. In November of 1917, he referred to his controversy with Brooks and the mortgage on the lease. Burton stated that he could replace the loan of the Texas Company. "He wanted to know what I would allow him for it, to get the man to put up the money. After some negotiations I finally agreed to allow double the amount of the money that the man would have to put up, and I reserved the privilege of trying to have that $10,000 restored to the old contract. And he said, 'What will I get out of it?' I said, 'Well, nothing; you get something from the other man.' He said, 'If he won't pay me none, what then?' We finally agreed that he was to get 5 per cent. regardless, from me, for the amount of money that was paid to the Texas Company. He asked for the terms of the contract, and things, and if that meant I would give a mortgage on my interest, which I agreed to do. He returned to Hous-

ton and later wrote me; there were letters that passed between us about this matter."

He denied that he had made the admissions against interest that had been testified to by Burton and the witnesses called by him, and stated that he never saw Beebe except on the occasion when he called at his office with a letter of introduction from Burton. He admitted that he had a conversation with Burton at the latter's office within a few days after the second well struck oil. He denied that Dr. Unger or any third party was present, and said: "In that conversation with Burton I said, 'Burton, I have just come from Mr. Vinson's office, and he told me that you claimed some interest in my Mexican properties,' I said, 'What about it, Burton?' He said 'I thought you would cut me in for a little something.' " Burton finally said that he did not claim and was not going to claim anything. He explained the checks issued in January of 1919 by saying that he lent Burton $300 on January 1, and on January 13 agreed to buy half interest in stock in the Texas Pine Oil Company for $600, and the second check was for the purpose of completing his subscription. No testimony was given by Aldape, Obando, or Merriwether.

Several witnesses testified that Burton admitted in their presence on various occasions during the years 1918 and 1919 that he had no interest in the lease. At the close of the evidence, Burton moved to strike that testimony, on the ground that, when he was adjudged a bankrupt in 1917, the title to all his property passed to his trustee in bankruptcy, and any admissions or declarations by him after he had parted with title would not be binding upon the trustee in bankruptcy. The court expressed the view that the bankrupt's estate would not be bound, but that Burton would be bound to the extent of any interest he might have over and above claims of the creditors in the bankruptcy proceedings.

After the argument, the court stated: "I will be very frank with counsel in this statement: That after this evidence was closed in the Burton v. Roos case I made up my mind practically that no contract had been established. That was entirely independent of the witnesses that were brought in thereafter to affirm something which it appeared to me had not been clearly proven, with sufficient clearness, and therefore the testimony of witnesses on both sides that had reference to the statements, affirming or disaffirming, as the case might be, title to one or the other parties, did not strike me with any especial force; my mind being centered upon the proposition in an effort to gather from the

evidence a sufficient showing to say that there was a contract or was not a contract. My mind had not gone any further than that at the time the case was closed. * * * and that is the reason I permitted the letters to be read in the arguments; I wanted to be fully informed."

Thereupon counsel for Roos expressed a willingness that all testimony relating to admissions by Burton be stricken out for all purposes. The court then stated, "As I say, I have not given any weight to any of the testimony," and, after pointing out that it was physically impossible for Roos to have signed the contract or received $500 from Burton on May 13 or 14, 1913, continued as follows: "Well, if that is the case, if it was physically impossible for him to have received the money, why what further evidence could be introduced for the purpose of showing this contract? * * * In other words, Mr. Burton may have had a contract such as he stated; he may have made that contract; but it certainly has appeared to me that he has failed to prove it. And, so far as these evidences of affirmation and denial are concerned, looking at it from the testimony introduced by Burton, its only weight would be that 'at some time we made some sort of a contract, and these statements are in affirmation of that.' It does not seem to me that you have met the demand which the law places upon your shoulders, to prove by a preponderance of the evidence—that is to say, by the weight of the evidence—that this contract existed as you say. * * * Mr. Burton does not testify with sufficient definiteness to warrant the conclusion that a contract was made at any other time than on the 13th or 14th of May. As I mentioned in my original statement, one of the essentials of the contract is to show that a consideration passed, and he says the consideration passed by the payment of the check that was paid, according to the stamp on the back of it, on May 14, 1913. And if the force and effect of the testimony is such as to require him to change his base and move him from that position, why he does not satisfy the court in his statement that 'it may be that I am mistaken about the date, but I am sure of the fact,' because it still devolves upon him to show the particulars and the circumstances of the date and of the fact, since he has failed in the first instance. * * * On the question of your motion, Mr. Browne, to strike out that testimony, I would like for the record to show that the court, by reason of the statements made, does not pass on that motion at all, because I have stated that I have not given any weight or consideration to the

testimony in arriving at my conclusions." Finally counsel for Roos entered on the record their consent that the motion to strike the testimony relating to admissions by Burton be granted.

In 1924 Burton made application to take the depositions of Mrs. Harper and Walter F. McCaleb. In support of that application the affidavits of Mrs. Harper and McCaleb, made in December, 1923, were submitted. Mrs. Harper's affidavit was to the effect that early in 1913 Burton and Roos held consultations with Aldape at her home in San Antonio in regard to securing oil leases in Mexico; that the district selected was near the Los Naranjos oil field; that in April, 1913, she advised Burton that the time was opportune; and that in the summer of 1915 Burton paid her $500 for her services in helping to secure such oil leases, which he stated to her would be drilled by the Texas Company. McCaleb's affidavit was to the effect that in 1913 he was president of the West Texas Bank & Trust Company; that Roos was indebted to his bank; that at one time when a loan was made it was with the understanding that a certain portion of it was not subject to check; that in the spring of 1913 a judgment was rendered against Roos which alarmed the bank; that Roos told him that Burton was interested in his Mexican oil ventures and had agreed to take up any judgments that had been or might be secured against him; and that he talked over the telephone with Burton, who assured him that Roos' statement was correct.

The District Judge denied the application to take the depositions, on the ground that due diligence had not been shown, and also because he was not convinced "that the character of testimony that will come in would be sufficient within itself to overbalance the mass of testimony on the same general issues that have already been considered by the court."

Frank H. Booth, of San Antonio, Tex., Joseph Welden Bailey, Jr., and Joseph W. Bailey, both of Dallas, Tex., A. J. Bell, of San Antonio, Tex., and Fred Brasted, of Fort Worth, Tex. (C. L. Bell, of San Antonio, Tex., on the brief), for appellants.

J. B. Lewright and William Aubrey, both of San Antonio, Tex., H. M. Garwood and Lewis R. Bryan, both of Houston, Tex., and W. B. Spencer, of New Orleans, La., for appellees.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

BRYAN, Circuit Judge (after stating the facts as above). The District Judge's statement in his oral opinion, that he had "not

given any weight to any of the testimony," standing alone, doubtless would sustain the contention of appellants that the case was not decided on its merits. But that statement, as clearly appears from what preceded it, had reference only to the testimony of witnesses relating to admissions against interest which they claimed had been made by Burton, and perhaps also by Roos. It had no reference to any other testimony or evidence in the case. The District Judge stated that he had permitted the letters exchanged by Burton and Roos to be read so that he might be fully informed. It is true he also indicated that it was physically impossible for Roos to have received the $500 as consideration and further evidence would be unavailing to prove a contract; however, as appears from other parts of his opinion, he based his decision, not on any error in the date of the contract, but on the conclusion that appellants had failed to prove the existence of the contract on the date claimed, or on any other date, because, as he construed the evidence, they had failed to show the particulars and circumstances of the date and of the facts. It was evidently the opinion of the trial court that the certificate of deposit was not cashed until after Roos went to Mexico; and, as it appears to us, the indorsements on the certificate of deposit, the proceeds of which Burton testified he paid to Roos, demonstrates that this opinion was correct. That certificate was not due until May 3, the day after it is conceded that Roos left San Antonio.

[1] Burton testified that he cashed it at a bank, but he did not say what bank. If it had been cashed at the State Bank & Trust Company, that issued it, it would not have gone through the clearing house. If it had been cashed at some other bank, on or prior to May 2, it is against all reason to suppose that it would not have been presented to the issuing bank, located in the same city, until May 14. The indorsements indicate that the certificate was either deposited with or cashed by the National Bank of Commerce on May 14, and was paid by the issuing bank on the same day. No other bank than the issuing bank would have perforated the certificate.

The evidence therefore seems to be conclusive that Burton did not pay Roos with the proceeds of his wife's certificate of deposit. If there were no other consideration than the $500, and that is all there was according to the alleged contract, we would agree at once with the trial court that no consideration had been proved, and that consequently no valid contract could have existed. But as, according to Burton, the proceeds of the certificate

of deposit, represented only a part of the consideration, the other part being represented by his agreement to advance and the actual advance of money on the judgments against Roos and Danforth, we must look further into the evidence. The District Judge saw the witnesses and heard their testimony. It is his province to pass upon their credibility. His decision on the facts ought not to be reversed unless it can be shown clearly and conclusively to be erroneous. That decision settled against Burton and in favor of Roos the irreconcilable conflicts in their testimony as to the existence of the contract, and as to what occurred at their various interviews.

It necessarily follows that the trial court was not convinced that Bell saw the contract. Burton, to say the least, was not an accurate witness. That is shown by his testimony that he received Roos' check for $1,000 at the time the alleged contract was signed, whereas his own receipt is conclusive evidence of the fact that he did not receive it until some weeks later, when it was delivered to him by Mauermann; and by his contradictory statements relating to the time when he first was informed by Roos that a lease had been obtained from Obando. As between the two principals, and aside from any attending circumstances, we are far from being able to say that Burton's accounts of the interviews that took place, concerning the judgments against Roos and Danforth, the purpose of the correspondence, and what was said about the ownership of the lease in Burton's office after the second well came in, were more credible than the accounts of those interviews given by Roos. But it is said that other evidence in the case corroborates Burton and contradicts Roos to such a degree as conclusively to prove the existence of the contract.

[2] Burton must rely on the contract which he asserts. As stated by the District Judge, he does not claim that there was any other. His testimony supports the theory, not of a resulting trust, but of a direct trust based upon contract. He must prove consideration so as to show a valid contractual relation. According to the documentary evidence, Obando did not acquire the lease in question from the owners of the land until nearly a year had elapsed after Roos made his trip to Mexico in 1913, and Roos did not acquire an option on that lease from Obando until nearly two years after it is claimed he and Burton entered upon their joint adventure of obtaining oil leases in Mexico. If the contract relied on had been entered into in 1913, it would not cover a lease acquired two years later, unless that lease had been obtained in pursuance of

negotiations begun in 1913; for the alleged contract had reference to a particular trip, and does not bear the construction that it would be binding for an indefinite period. On the other hand, the lease, if it was acquired as a result of negotiations entered into or even begun on the trip to Mexico, would be taken subject to the alleged contract, regardless of the time that elapsed before it was finally obtained. There was no direct testimony that the Obando lease was acquired in pursuance of negotiations begun on the trip to Mexico in 1913, and Roos testified that it was not. Some comment is made on Roos' failure to call Aldape, Obando, and Merriwether to support his negative testimony. His case would have been stronger if he could have supported his testimony in this way. Appellants could equally well have taken the testimony of Aldape and Obando to sustain the burden of proof which was upon them, but doubtless they had no information that Merriwether knew anything about the case. On the other hand, Conn, the trustee in bankruptcy, and a party to this suit, failed to testify that he knew of Burton's claim before the discharge in bankruptcy was granted. There might have been good reasons, though the record fails to disclose them, why the testimony of these parties who could have thrown light on the controversy was not taken. At any rate, we take the case as we find it.

[3] Before Roos left San Antonio for Mexico on May 2, 1913, he was in financial straits. He does not deny the testimony of the bank tellers, and therefore it is to be conceded, that he could not have withdrawn the funds he had on deposit at the West Texas Bank & Trust Company without the approval of McCaleb, the president, or of the vice president of that bank, because of judgments that had been or were then in process of being obtained against the partnership of Roos & Danforth. His bank deposits were made available by an arrangement whereby Burton satisfied the judgment creditors with the payment of $1,000 contributed by Roos.

Burton was also a partner of Danforth, and conceivably might be concerned about the liens of judgments on land in which he had a half interest. Besides, Burton never disclosed whether on an accounting he would be indebted to Danforth or Danforth would be indebted to him. Whether Burton agreed to take up and carry the judgments temporarily, and eventually to hold Roos liable for half of the amount advanced as he testified, or instead agreed to release Roos immediately from liability thereon, as Roos testified, was a question in dispute. Burton's testimony is

not corroborated merely by the circumstance that he actually took up and carried the judgments until 1916, and then released Roos, but is equally consistent with the theory that he violated his agreement. The release was not finally given, as Burton testified, because Roos represented that he had spent more money in obtaining oil leases than Burton had, but was given in pursuance of a demand by Roos, and upon his surrender of a note for $2,750 which purported to bind the firm of Burton & Danforth.

It would seem, on account of his financial condition and standing, that Roos could have been of but little, if any, assistance in negotiating a loan for the republic of Mexico. However, he had befriended Aldape by becoming surety on his bond, and, after Aldape entered the Mexican cabinet, it is quite likely that he was not unwilling to assist Roos either to negotiate a loan for Mexico or to obtain oil leases. Doubtless Roos did see Aldape in Mexico City, and it may be that he entered into negotiations with Oleson at Aldape's suggestion. Those negotiations show that Roos, whatever other mission he had in Mexico, was willing to acquire oil leases, but they do not show that he acquired any at that time. The circumstance is too remote to support an inference that at that time Roos acquired or negotiated for the Obando lease, for he was not able, in 1913, or at any time prior to December of 1918, to pay any substantial amount on an oil lease.

The very fact that Brooks advanced the money necessary to pay for the assignment of the Obando lease in May of 1915 is circumstantial evidence of the strongest kind that Roos had only a short time before that obtained his option on that lease. Burton and Roos agreed that the first serious discussion that they had about the lease was in November or December of 1917. The occasion of that discussion was the indebtedness secured by the lease. A controversy had previously arisen between Brooks and Roos over the question whether the original loan of $10,000 should have been included in the mortgage for approximately $17,000. Brooks took the position that the entire indebtedness which was secured by the mortgage was due on July 2, 1918; Roos contended that $10,000 of that amount should not be called for until the lease had been developed, but his attorneys disagreed with him and adopted the contention of Brooks. As a consequence, the relations between Roos and his attorneys reached a point where they were not cordial. Roos therefore desired to get the advice of another attorney and to prevent, if possible, the fore-

closure of the mortgage for the entire amount, as events seemed to indicate that the mortgage would probably become due before the lease could be developed.

Burton interviewed Vinson, Wolters, and a representative of the Texas Company, for the purpose, as he says, of protecting his interest in the Obando lease, and for the purpose, as Roos says, of taking up the loan held by the Texas Company. It is argued that, if Burton had been actuated by the latter purpose, he would not have represented to the Texas Company, his desire to continue the loan with that company, but would have undertaken to replace the loan with some one else, so as to earn a commission and such part of the amount equal to the loan, which Roos testified he was willing to pay, as could be obtained from the third party taking up the loan. But it is to be remembered that Roos, according to his testimony, reserved the right to have the Texas Company continue to carry $10,000 and have that amount deducted from the amount Burton was to obtain, and that papers relating to the controversy with Brooks were desired, and Vinson was employed as attorney, in order to determine whether the Texas Company could be compelled to postpone its demand for $10,000 of the amount secured by the mortgage until after the drilling of wells had been completed. In the event Roos and his attorney were able to secure a reduction of the Texas Company's demand, the amount necessary to be borrowed to prevent foreclosure of the mortgage would be $7,000, which it would still be necessary to borrow from some third party. Burton might well have been willing to accept as his compensation 5 per cent. of the smaller loan and such part of the additional amount equal to the loan as he could get. Burton's letter, in which he stated that he had represented to Scott of the Texas Company that he would "refinance" the loan and pay it off if that company would not extend it, can be more conveniently dealt with as a part of the correspondence between him and Roos.

[4] As to that correspondence. Burton did not assume to employ Vinson, but acted the part of an agent to arrange for an interview between attorney and client. The first letter Roos wrote in reply contains the expressions "our matter" and "others interested," but it was written for the purpose of being shown to Vinson, as is explained in a second letter. Evidently Roos did not know what Burton had said to Vinson about the ownership of the lease, and therefore did not want to appear to Vinson to contradict any representation Burton might have made. The second letter is not to be construed as a recognition of interest, but rather to explain the purpose of impliedly recognizing an interest that did not in fact exist. If the first letter correctly stated the facts, there was no need of an explanation. Burton's letter reporting interviews with Scott and Wolters, in each of which he claims he represented that he had an interest, and in addition that he had told Scott he would pay off the mortgage loan if necessary to protect that interest, were written within a week of each other. Of course Burton's declarations are not evidence in his favor. It is not reasonable to suppose that either Scott or Wolters would have been discussing their business or professional matters with a stranger. Therefore, in order to get an interview, Burton would have to make it appear that he was interested in the affairs of Roos. He made the same representation first to Scott, then a few days later to Wolters, and secured interviews, but did not directly claim to Roos that he was interested; he only explained how he was able to obtain the information that was desired. If, however, these letters can be construed as making a claim of interest, the letters of Roos in reply do not by silence recognize the claim, but, on the contrary, one of them refers to Burton as having no personal interest, and the other speaks of his own sole, individual interest in the contracts with Brooks and in the lease. The letter that Roos wrote, containing the expression "our well is in," is the one upon which most stress is laid, and naturally so. The expression there used is open to the construction that it recognized Burton as a partner. At the same time it is an accurate expression, and could well have been meant to refer to the interests of the Texas Company and of Lane, Wolters & Story, as well as to the interest of Roos. Then came Burton's first direct assertion of interest shown by the correspondence. It was immediately repudiated.

Burton's conduct throughout was not such as would reasonably be expected of one who was a half owner of valuable property. He displayed the utmost indifference to the provisions of the original contract with Brooks, and to the development of the lease for more than four years after he understood there was a lease and before he found out that it was put up as security for approximately $17,000 that had been advanced to Roos. He does not claim that he raised any objection to the hypothecation of his half interest when informed about it, or demanded an accounting. He says that for awhile even after this he did not disclose his interest to the Texas Compa-

ny, because Roos would lose control, notwithstanding the fact that admittedly Roos had less than a half interest in the lease. The clause in the contract providing against the transfer of any interest is brought forward as a reason why his interest should be kept concealed. Although it does not appear that he knew of that clause, it does appear that he freely discussed his claim of interest with the Texas Company. He says he demanded written evidence of his rights after Roos had denied by letter that he had any, but was content to accept a mere oral promise that his rights would be recognized, even after he had himself informed the Texas Company of his interest, according to his testimony, and there could have been no possible reason for longer postponing a formal written acknowledgment by Roos of such interest. Within a few days after he says that promise was made, he admits that he accepted only $300 out of an additional loan of $10,000 from his partner, who already had received $17,000 and had failed to account to him for his share. In 1917 he was adjudged a bankrupt, but did not list among his possible assets his claim of interest in the lease, although at that time the lease was thought to be very valuable, and a well was being drilled upon it. And, after the well came in, with its promise of great wealth to its owners, he obtained his discharge in bankruptcy without disclosing his claim of interest in it.

We are unable to say that the established facts and circumstances corroborate the testimony of Burton and contradict that of Roos sufficiently to support the conclusion that the decree appealed from is erroneous. Nor in our opinion is the case of appellants materially strengthened by the testimony relating to admissions against interest claimed to have been made by Roos. In a case of this kind, where it is sought to prove title, such testimony is required to be full, clear, and satisfactory. Allen v. Withrow, 110 U. S. 119, 3 S. Ct. 517, 28 L. Ed. 90; Pomeroy's Equity Jurisprudence (4th Ed.) § 1040; Birmingham v. L. & N. R. Co. (C. C. A.) 297 F. 816. The rights of an innocent third party are not involved, and no question of estoppel arises. Oral statements are so liable to be misunderstood or misinterpreted that they ought to be received with great caution. Greenleaf on Evidence, § 200. The testimony of Beebe, Dunning, and Hoffman is not convincing. They all make the same mistake in the name of the well. As circumstances indicating that the admission testified to by them never was made, it was proved that one of these witnesses was afterwards introduced to Roos by letter, and another failed to identify him at the trial. The witness Unger admitted that he kept a statement prepared by Burton which he read over just before the trial, and upon which he apparently relied in giving his testimony; so that, if the statement was incorrect, his testimony given several years afterwards was liable to be so. The other witnesses were closely associated, either by relationship or by business with Burton, and, even though they were honestly attempting to repeat statements made by Roos in their presence, the length of time that had elapsed would naturally cause their independent recollections to be indistinct, and make it probable that they had confused the original statements with conversations about the case that had taken place with others in the meantime.

[5] It is assigned as error that the court erred in refusing to take the depositions of Mrs. Harper and McCaleb. It is not shown that Mrs. Harper would testify to any matter of substance that was in dispute. In her affidavit in support of the application, she stated that Burton paid her $500 for her help in securing oil leases. Even Burton does not claim that. McCaleb stated in his affidavit that a portion of Roos' bank deposit was not subject to check; but the bank tellers testified to that, and Roos did not deny it. What McCaleb was interested in was the judgments against Roos and Danforth, and naturally that is what he would have discussed, especially in a telephone conversation. Any testimony by him as to an additional admission against interest by Roos would have been merely cumulative. It therefore was not error to refuse to reopen the case in order that the testimony of these two witnesses might be taken.

The decree is affirmed.